**UNITED STATES DISTRICT COURT**
**SOURTHERN DISTRICT OF FLORIDA**
**CASE NO. 26-CR-20177-KMW**

**UNITED STATES OF AMERICA**

**vs.**

**JOSS SACKLER,**

**Defendant**
_______________________________________/

**SENTENCING MEMORANDUM**

COMES NOW, Defendant Joss Sacker requesting that the Court enter judgment sentencing her to time served and one year of supervision, with a special condition of home confinement for six months (effectively six months of home confinement and six months of additional supervision). Defendant's understanding is that the government intends to request a sentence of 12 months of home confinement followed by 12 months of supervision. As explained in more detail below, Ms. Sackler submits that a sentence of six months home confinement, which is the low end of what the United States Sentencing Guidelines ("Guidelines") recommend, and six months of additional supervision rather than 12 months of additional supervision, correctly takes into account the recommendations of the Guidelines and the factors outlined in Title 18, U.S.C., Section 3553, including her immediate acceptance of responsibility and the aberration of Ms. Sackler's crime in her otherwise law-abiding and productive life.

## I. The Legal Framework for Sentencing Analysis Under Section 3553(a) and Additional Guidelines Consideration

This Court is already expert in sentencing issues, but just to reiterate the applicable standards, courts have been instructed to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth" in Section 3553(a), and specifically to consider:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed—

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

*See* 18, U.S.C., §3553(a).

Furthermore, the Presentence Investigation Report ("PSR") notes that the applicable Guidelines, which fall into Zone B, permit a non-custodial sentence, specifically "a sentence of probation that includes a condition or combination of conditions that substitute intermittent confinement, community confinement, or home detention for imprisonment according to the schedule in § 5C1.1(e)" (PSR ¶ 83). Notably, because the Defendant received a reduction as a "Zero Point Offender" – *i.e.,* this is the Defendant's first brush with the law, "a sentence other than a sentence of imprisonment, in accordance with §5C1.1(b) or (c)(3) is generally appropriate, § 5C1.1, comment. (n.10)" (PSR ¶ 84).

Ms. Sackler respectfully submits that these sections of the statute and the Guidelines support a sentence of six months' home confinement and six months of additional supervision.

## II. Argument

A. Circumstances of the Offense and History and Characteristics of the Defendant

Ms. Sackler is 42 years old, has a doctorate degree in linguistics from City University of New York ("CUNY"), and is a mother to three children (the oldest of whom are twelve-year-old twins), who she shares with her husband, David Sackler. She is close with her parents, who live next door to her and remain married to this day. Ms. Sackler has never been arrested nor had any previous problems with law enforcement.

However, despite her accomplishments and active family life, Ms. Sackler has a variety of physical and mental health ailments that have plagued her, as detailed in the PSR. The several years predating the conduct at issue in this matter were particularly difficult for Ms. Sackler from both mental health and physical health standpoints. Though Ms. Sackler has never worked at nor had anything to do with Purdue Pharmaceuticals, the Sackler name has become synonymous in the public's mind with the opioid epidemic, and she in particular has been targeted with vitriol by media and hate from online trolls. She has received numerous death threats, which caused her to hire extra security, restrict her business and social activities, and spend less time outside her home. Most distressing, her children have been harassed and threatened, as well. Even a cursory online search for her name reveals the high level of animosity to which she is regularly subjected, which continues to this day. Furthermore, in addition to the chronic pain that Ms. Sackler suffers due to a rare autoimmune condition (see PSR ¶¶ 47-51), Ms. Sackler had four surgeries between 2022 and 2024, the two years preceding the events that led to the conduct charged in this matter. She struggled with recovery and pain after each one, turning more and more to opioids and other powerful medications to help manage her symptoms.

In her efforts to obtain pain medications during this two-year period – for post-surgical recovery as well as her long-term chronic pain and mental health issues – Ms. Sackler went outside of her team of doctors, who had declined to prescribe additional medications for pain abatement.

In February 2024, Ms. Sackler's father had surgery in Colombia and Ms. Sackler, when visiting her father in the hospital, learned that the hospital's pharmacy, which dispensed the medications for her father, could also provide opioids and other medications to her without her needing to see a doctor first. Thus, that month, Ms. Sackler returned to the U.S. from Colombia and brought with her a variety of medications that she obtained from the hospital pharmacy, including, among other things, certain opioids.

Ms. Sackler's father was eventually discharged from the hospital and returned to the U.S. However, over the months that he remained in the hospital and thereafter convalescing in Colombia before being cleared to travel, Ms. Sackler became friendly with the hospital pharmacist and they remained in contact.

In late May or early June 2024, the pharmacist contacted Ms. Sackler via WhatsApp and asked if she needed more medications. Ms. Sackler agreed to place another order, which resulted in the box seized in June 2024 by the U.S. Customs and Border Protection at Miami International Airport (PSR ¶ 11).

When Ms. Sackler learned of the seizure, she panicked and deleted her WhatsApp messages with the Colombian pharmacist. She very quickly regretted that decision and, upon retaining counsel, attempted to retrieve those messages, including by hiring retired law enforcement and forensic data analysts to assist in that endeavor. However, the WhatsApp messages were irretrievably lost.

B. Deterrence, Protecting the Public, Needed Treatment in the Most Effective Manner and Other Section 3553(a) Factors or Reasons for a Variance

Ms. Sackler is extremely remorseful and ashamed of her actions, which exposed her for the first time to the criminal justice system due to her personal problems with chronic pain and substance abuse. The seizure was a wake-up call regarding the depth of her dependence on controlled substances and the poor, selfish decisions she made as a result. She very quickly resolved to take serious, concrete steps to correct her mistakes, change her life to overcome her substance abuse problem, and accept responsibility for her errors.

It is not hyperbole to state that Ms. Sacker regretted the conduct and tried to make amends the minute after it happened. She immediately took responsibility, initiated contact with the government through counsel, and agreed to cooperate with the investigation. Through counsel, she detailed everything that occurred prior to the seizure, including the earlier times she obtained oxycodone and other controlled substances without a valid prescription of which the government had no knowledge. She provided documentary evidence and a plethora of medical records to corroborate what that she told the government. As noted above, she even tried to retrieve the text messages she had deleted. While her conduct prior to the seizure was a personal failing, her subsequent conduct was admirable and should be considered super-acceptance, for which courts in this District have granted leniency.

Moreover, within days of the seizure, in June 2024, she entered an in-patient, residential substance abuse facility, which required her to commit to a 60-day structured, intensive treatment regime that limited her contact with friends and family. Being away from her children was a significant hardship for Ms. Sackler. She marked her 40th birthday – normally a milestone event in a person's life – alone and separated from her family in the rehabilitation clinic. Worse, she missed her children's birthdays. She also was not present nor able to help and console one of her children

when they broke their arm playing soccer. However, Ms. Sackler understood that she needed to take her addiction seriously and the discomfort, isolation and stark reality-check were necessary for her recovery, with treatment that could provide her with the tools for future pain management. Her medical issues, mental health struggles, and chronic pain were not going away. But she recognized that those ailments needed to be addressed through continued drug abuse treatment without a first-instance reliance on controlled substances in order to avoid repeating the poor choices that addicts are prone to make.

Ms. Sackler made substantial improvements at the clinic, starting with a detoxification regimen (PSR ¶ 69). Once detoxification was complete, therapy and educational programs became the primary focus and Ms. Sackler's medications were adjusted to reduce her reliance on opioid pills while directing her towards other methods of pain management.

After she was discharged from in-patient treatment, Ms. Sackler adhered to a structured and thorough program overseen by a group of professionals that coordinated her normal therapy and the medical treatment that she had been receiving prior to her in-patient program with new weekly individual therapy specifically focused on substance abuse, weekly randomized drug testing, three to five weekly support group sessions, and monitoring of her medications to maintain sobriety (PSR ¶¶ 71-73).

This continued for one year following her discharge. During this time, she did not miss a therapy session nor fail a drug test. After successfully completing that intense regimen over 12 months, in August 2025, the health care professionals amended the program to reduce her group and individual therapy sessions, as well as altering the random drug tests to be twice monthly rather than weekly (PSR ¶ 74).

To this day – over two years since the seizure – Ms. Sackler has never missed a single therapy session nor failed a drug test (PSR ¶¶ 74, 76).

Ms. Sackler is working every day to continue to make positive improvements as she continues to address her addiction and mental health issues. She is steadfast in adhering to the discharge plan devised for her at the rehabilitation clinic. She is motivated by a desire to do better for herself and her family.

Given Ms. Sackler's documented substance abuse and mental health issues – and the heretofore successful treatment program that Ms. Sackler has completed for over two years, it is respectfully submitted that leniency is appropriate here, and particularly a non-custodial sentence that would allow her to continue the treatment. Her conduct, while wrongful, was aberrant and done in a state of panic. It was conduct undertaken with the impaired judgment of a substance abuser and it stands in clear contrast to the more typical premeditated obstruction conduct the government regularly prosecutes.

There is no reason to believe that Ms. Sackler would engage in future criminal activity. There is no need to protect the public or provide for specific deterrence. She has no criminal history and this experience – even prior to any imposed sentence – has compelled her to acknowledge and confront her substance abuse problem, which was the basis for her actions. As the unlawful conduct here was intricately tied to addiction, "a sentence other than a sentence of imprisonment" (PSR ¶ 84), which would allow Ms. Sackler to address her addiction and the underlying mental health issues that precipitated her drug abuse, is particularly appropriate for this matter with rehabilitation and needed treatment being one of the goals of sentencing.

She has also already received significant punishment with this prosecution that publicly brands Ms. Sackler for life not just as a criminal but a felon, and has forced her to share her mental health struggles and addiction issues with the same public that routinely casts scorn and ridicule

upon her.[1] Furthermore, for the two years since the seizure that this matter has been pending, starting from the two months of in-patient therapy when Ms. Sackler was separated from her family, she has been living with the uncertainty of how the government would ultimately decide to resolve this case and what sentence a judge would pronounce. To the extent someone would identify with Ms. Sackler and evaluate this matter on a scale of general deterrence, no one would view this matter as anything other than a cautionary tale with conduct not to be emulated. No additional deterrence or significant punishment is necessary.

Ms. Sackler recognizes that the government, in recommending a sentence that does not include incarceration, is demonstrating a level of leniency. However, 12 months' home confinement – the top of the Guidelines range, while certainly much better than incarceration, is oppressive and not needed under the circumstances detailed here. Nor is an extended period of supervision warranted considering that Ms. Sackler has already effectively been under supervision for over two years and she intends to continue her treatment under the guidance of the medical professionals, including random drug testing, regardless of whatever sentence the Court imposes because that treatment has proven to be effective in allowing Ms. Sackler to control her mental health and substance abuse issues and to turn her life around.

For these reasons, Ms. Sackler respectfully submits that the appropriate sentence – "sufficient, but not greater than necessary, to comply with the purposes set forth" in Section 3553(a) – is six months' home confinement (the low end of the Guidelines' recommendation) and six months of additional supervision.

Lastly, we address one final topic: while it is indisputable that Ms. Sackler's last name (by marriage) is associated with the opioid epidemic in this country and thus many people have negative

[1] *See* DE 23.

associations with her, it bears repeating that neither Ms. Sackler herself nor this matter have any relation to Purdue Pharmaceuticals nor the opioid epidemic. The import here is that Ms. Sackler is a woman with serious medical and mental health issues who, but for her addiction, is an otherwise law-abiding citizen who has never before been in trouble with the law. And she is a wife, a loving mother to three young children who need her, a devoted sister and daughter to 80-year-old parents for whom she helps to care. That is the individual who should be considered when determining the appropriate sentence for her.

**Conclusion**

For all these reasons, Ms. Sackler respectfully requests that the Court show leniency and sentence her to time served and one year of supervision, with a special condition of six months' home confinement.

Respectfully submitted,

AKRIVIS LAW GROUP, PLLC

By: /s/ *Walter Norkin*

Walter M. Norkin, Esq.
FL Bar No. 1022653
100 SE Second Street, Ste. 3650
Miami, Florida 33131
Telephone: 305-359-6399
Email: wnorkin@akrivislaw.com

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on August 12, 2026, the undersigned electronically filed the foregoing document with the Clerk of the Court using CM/ECF.

*/s/ Walter Norkin*
Walter Norkin